## C. C. MANGUM, INC. v. WILLIAM AARON GASPERSON AND GEORGE MATEJA.

(Filed 20 May, 1964.)

**1. Appeal and Error § 41—**

Where taking plaintiff's evidence as true and considering it in the light most favorable to plaintiff nonsuit is proper, the exclusion of testimony tending to establish facts already in evidence cannot be prejudicial.

**2. Negligence § 26—**

Nonsuit for contributory negligence is proper when this is the sole reasonable conclusion that can be drawn from plaintiff's own evidence.

**3. Highways § 7—**

Where a contractor for the improvement of an airport is granted permission by the Highway Commission to construct a dirt ramp over the highway to protect it from heavy equipment, the Commission's requirements with reference to signs and flagmen are primarily for the protection of the users of the highway and do not confer on the contractor special privileges in respect to right of way. G.S. 136-26, G.S. 136-18(5), G.S. 136-18(18).

**4. Same—**

Irrespective of G.S. 20-156(a), a contractor for the improvement of an airport who is granted permission to maintain a dirt ramp across a highway is under duty, before operating its earth moving equipment onto and across the ramp, to exercise due care to see that such movement can be made with safety and without injury to users of the highway.

**5. Same—Evidence held to show contributory negligence causing collision between truck and plaintiff's equipment crossing highway on dirt ramp.**

The collision in suit occurred between plaintiff's earth mover traveling west immediately after it had entered upon a dirt ramp, maintained across the highway with the permission of the Highway Commission, and defendant's truck which was traveling south on the highway. The evidence disclosed that plaintiff's flagman attempted to flag the truck driver, but notwithstanding he saw the truck driver was watching equipment to his right, and was inattentive to his signals, made no effort to signal the earth mover to stop or reduce speed, and that the operator of the earth mover, notwithstanding he had seen the truck when it was some distance away, did not observe the truck as it approached the ramp and did not apply his brakes until he saw the truck "coming up on the ramp." *Held:* The evidence discloses contributory negligence on the part of plaintiff's agents constituting a proximate cause of the collision, and nonsuit was proper.

APPEAL by plaintiff from *Walker, Special Judge,* November 1963 Assigned Civil Session of WAKE.

On May 8, 1961, there was a collision between plaintiff's earth mover, operated by Sam Harris, and defendant Mateja's dump truck, operated by defendant Gasperson. The collision occurred on a dirt ramp

plaintiff had constructed across Rural Paved Road #1002 between the Raleigh-Durham Airport and Morrisville. In each instance, the owner admitted the operator was its (his) agent.

Plaintiff instituted this action to recover for the damage to its earth mover and for loss of its use, alleging the collision and its damages were proximately caused by the negligence of Gasperson.

Defendants, by joint answer, denied negligence and conditionally pleaded contributory negligence. In addition, defendant Mateja alleged a counterclaim for the damage to his truck, alleging the negligence of plaintiff's agents was the sole proximate cause of the collision and his damage.

At the conclusion of plaintiff's evidence, the court allowed defendants' motion for judgment of involuntary nonsuit and dismissed plaintiff's action. (Note: The judgment, reciting that defendant Mateja had elected to take a voluntary nonsuit on his counterclaim, dismissed said counterclaim "as of voluntary nonsuit.") Plaintiff excepted and appealed.

*Bunn, Hatch, Little & Bunn, Dupree, Weaver, Horton & Cockman and Jerry S. Alvis for plaintiff appellant.*

*Smith, Leach, Anderson & Dorsett for defendant appellees.*

BOBBITT, J. Plaintiff assigns as error (1) the exclusion of certain testimony of J. P. Brown and (2) the judgment of involuntary nonsuit.

Rural Paved Road #1002, referred to hereafter as the highway, is "a blacktop road," approximately 18 feet wide, with two driving lanes. It runs generally north and south.

On and prior to May 8, 1961, plaintiff had a contract with "Raleigh-Durham Airport" with reference to constructing an extension of the airport runways. Under its contract, plaintiff was engaged in hauling fill dirt "to raise the grade up to usable level." Plaintiff's earth movers crossed the highway on the dirt ramp referred to below.

The ramp, running generally east and west, was constructed by plaintiff and was "from 14 to 16 feet" wide. It was "wide enough for them pans to go across." The dirt was piled up about 16 inches in the middle and sloped off. The ramp was to protect the highway from damage "when crossed by the heavy equipment operated by plaintiff." On the highway approaches to the ramp, these signs had been erected and were in place: "25 MPH," "SLOW," and "CONSTRUCTION."

The Chief Engineer of the State Highway Commission testified: "The ramp placed across the Morrisville-Airport Road was so plac-

ed with the permission of the North Carolina Highway Department. It existed with permission on May 8, 1961."

Mr. J. P. Brown testified he was District Engineer for the State Highway Commission during May, 1961; that the Morrisville-Airport area was under his supervision; that "our supervisor and foreman" checked on the work out there at least twice a day "to see if proper signs and flagmen were being maintained"; and that he personally checked on it periodically. Mr. Brown testified further that, "(o)nce a ramp would be established across a highway by the proper authority," he "had the right to police it."

A portion of the excluded testimony of Mr. Brown relates to whether the State Highway Commission had authorized the placing of the ramp across the road. In view of the Chief Engineer's testimony, the exclusion of Mr. Brown's testimony concerning this subject is without significance in passing upon whether plaintiff's action should have been nonsuited.

Other excluded testimony of Mr. Brown was to the effect he had observed the ramp, the signs and the flagmen prior to and on May 8, 1961; that they were adequate so far as he could see; and that, on May 8, 1961, when he was in the vicinity of the ramp, "the flagman was flagging traffic." Mr. Brown was not present when the collision occurred. There is ample evidence as to the ramp, the signs and the presence of a "flagman" on the occasion of the collision. Hence, the exclusion of Mr. Brown's testimony is without significance in passing upon whether plaintiff's action should have been nonsuited.

The earth mover involved in the collision was a large, twin-engine Euclid scraper. It was mounted on four large (seven feet high) rubber tires. The pan, which carried 33 yards of dirt, was approximately 14 feet wide. The earth mover, when empty, weighed approximately 80,-000 pounds. When loaded, it weighed approximately 166,000 pounds. Harris was the regular operator.

The collision occurred on the ramp. Harris, operating the loaded earth mover, was proceeding in a westerly direction. Gasperson, operating the truck (loaded with gravel), was proceeding in a southerly direction along the highway in the (right) lane for southbound traffic. Thus, the earth mover approached the highway and proceeded onto the ramp from Gasperson's left. Gasperson was attempting "to go up over" the portion of the ramp in the truck's line of travel when the left side of the truck, "between the back of the cab and the body," was struck by the right front of the earth mover.

As to what occurred on the occasion of the collision, the evidence consists of the testimony of Glenn Russell, the investigating State

Highway Patrolman, and of Sam Harris and C. S. Dampier, both agents of plaintiff.

Dampier was employed by plaintiff as a flagman and also to keep a record of the number of loads hauled by each earth mover across the ramp. He kept this record by making notations on a sheet of paper fastened to a "clip-board." The clip-board was made of plywood, painted red and was "something similar to 13 or 14 inches long and 6 or 7 inches wide." A red flag, "10 to 12 inches by 7 or 8 inches," was attached to the end of the clip-board by a piece of wire. Dampier testified: "When you waved the board, the flag would flop back and forth. It was loose at the ends so the ends would come around like that when you would wave it.".

Dampier, on direct examination, testified: He was standing, facing north, in the highway lane for southbound traffic. The truck was coming straight toward him. When the truck was approximately 500 feet away, he started signaling the truck to stop and did not stop signaling until he "threw the flag down." He saw the earth mover "coming by." As the truck approached, "he (Gasperson) had his head turned to the right watching the equipment work out there." He (Dampier) "ran up partly on the mount of this dirt and hollered." There was so much noise he (Dampier) did not know whether Gasperson "heard that or not." When he (Dampier) thought the truck and earth mover were going to collide, he "threw the flag down and ran." He heard but did not see the collision. Gasperson was "about 8 or 10 feet from the ramp or to the place where the vehicles collided when he turned his head back towards the road." When he (Dampier) last saw the two vehicles, both were coming up on the ramp.

Dampier, on cross-examination, testified: When he first saw the truck, "about 500 feet away," he "didn't give any signal." He testified: "I don't give a signal if there is no earth mover coming towards me. The dump truck was maybe 100 feet away when I first saw the earth mover. I had no occasion to give the dump truck a signal until then. When he got within good vision, about 75 or 50 feet, I saw he was turned to his right." Dampier testified further: "First time I saw him I started flagging him about 100 feet away; he was then looking off to his right. I knew he was looking to his right. I could see him doing that. I did not then try to flag the earth mover. I am positive the dump truck slowed up just before he went up on the dirt there. Actually it slowed down and almost stopped. I imagine one of these ten-wheel dump trucks loaded with gravel would bust wide open if it hit that ramp at 20 mph. All dump trucks loaded would have come in low gear almost to a stop to get over there. In the meantime, the Euclid

kept on coming. I never turned toward the earth mover at all. The dump truck was on its right-hand side of the paved highway."

Dampier testified further on cross-examination that the truck and the earth mover were approaching at approximately the same speed, "probably 15 or 20 mph," and that there was no obstruction of Gasperson's view to his left or of Harris' view to his right as the vehicles approached the ramp.

Harris, on direct examination, testified: He could and did first see the highway when "about 150 or 200 yards from it." He then saw the truck. It was going south, "going about 20 or 25 miles per hour." He observed nothing unusual "about its operation." He (Harris) "kept on approaching toward the ramp." He (Harris) observed Dampier. Dampier was standing on "the left-hand side," facing north, "flagging the flag like that." He saw Dampier "run." Harris testified: "After I saw Mr. Dampier run, I seen the truck was going up on the ramp and I seen I was going to hit him, so I applied my brakes and turned right short to the left as far as I could, tried to miss him. The vehicles collided. My right front end of the earth mover hit the truck about right at the end of the body and the door, my right-hand side hit the left-hand side."

Harris, on cross-examination, testified: The maximum speed of the earth mover was "about 28 mph." Approaching the dirt ramp, he had the earth mover "in high gear" and "was going 20 mph." When he first saw the truck, the earth mover and the truck were approximately the same distance (150 to 200 yards) from the ramp. Harris testified: "I won't say whether he (Gasperson) slowed up and almost stopped at the crossing. I won't say because I had my mind on my business. I do not know whether he slowed up and almost stopped or not. At that particular time I was not watching him close enough to tell whether he almost slowed up or stopped. The first time I put on brakes was when the truck was coming up on the ramp . . . The front of my vehicle when I put on brakes was just before I went onto the ramp. I would say the front of my vehicle was about 20 feet from the edge of the pavement when I first put on brakes." Again: "The front of my vehicle was still on the ramp when I hit him." Again: "The front of the dump truck was not off the ramp at the time of the impact. I don't actually know what the dump truck did when it came on the ramp." Again: "He (Dampier) was facing the dump truck all the time. When he was facing the dump truck he was looking straight ahead at the dump truck; kept looking that way and facing that way. Not that I recall did he ever turn his head or body toward me."

Unquestionably, there was ample evidence to support a finding that negligence on the part of Gasperson was a proximate cause of the

collision and resulting damage. The crucial question is whether plaintiff's evidence discloses contributory negligence as a matter of law. Decision requires that the evidence be considered in the light of the well-established and oft-stated rule that judgment of involuntary nonsuit on the ground of contributory negligence should be granted when, and only when, the evidence, when taken in the light most favorable to plaintiff, establishes plaintiff's contributory negligence so clearly that no other reasonable inference or conclusion may be drawn therefrom.

In *Equipment Co. v. Hertz Corp.* and *Contractors, Inc. v. Hertz Corp.*, 256 N.C. 277, 123 S.E. 2d 802, stressed by plaintiff, a similar ramp was used as a crossing by the earth movers of the State Highway Commission's contractor. This Court held, where travel on the highway was closed temporarily by means of warning signs and flagmen's signals, it was the duty of the motorist to stop and yield the right of way to the contractor's earth movers. In the cited case, decision was based on G.S. 136-26, a statute authorizing the State Highway Commission, through "its officers or appropriate employees, or its contractor," to close the highway to public travel while such ramp is in use by its contractor's equipment. The exercise of this authority, which relates to a highway "in process of construction or maintenance," is for the public benefit. In the cited case, *Moore, J.*, speaking for this Court, said: "The closing or temporary closing of highways or portions thereof during construction and repair operations is designed to avoid interruptions and delays in the prosecution of the work. If the earth movers in the instant cases were required to stop and yield the right-of-way to travelers on the highway, the expense of construction and the time required to complete the project would be greatly increased."

Here, no highway project was involved. While the Commission granted *permission* for the construction by plaintiff of the ramp and the use thereof by plaintiff as a crossing for its earth movers, neither the Commission nor the users of the highway derived any benefit from such construction and use. The permission granted was for the benefit of plaintiff in performance of its contract with "Raleigh-Durham Airport." Under the circumstances, we think the Commission's requirements with reference to signs and flagmen were primarily for the protection of users of the highway rather than for the protection of plaintiff's equipment and operations. In short, the permission granted by the Commission did not confer on plaintiff special privileges in respect of right of way. We find nothing in G.S. 136-18(5) or in G.S. 136-18(18), cited by plaintiff, inconsistent with this view.

G.S. 20-156(a), stressed by defendants, provides: "The driver of a vehicle entering a public highway from a private road or drive shall

yield the right-of-way to all vehicles approaching on such public high-way." We deem it unnecessary to determine whether plaintiff's con-duct constituted a violation of this statutory provision. Under the cir-cumstances disclosed by this record, we are of opinion, and so decide, that plaintiff, before operating its earth mover onto and across the ramp, was under the legal duty to exercise due care to see that such movement could be made in safety and without injury to users of the public highway.

When considered in the light of the foregoing legal principles, the conclusion is inescapable that the evidence discloses that (contrib-utory) negligence on the part of plaintiff's agents was a proximate cause of the collision and resulting damage. Dampier, the flagman, not-withstanding he saw Gasperson was looking to his right (away from Dampier and away from the approaching earth mover), "watching the equipment work out there," made no effort whatever to signal the earth mover to stop or to reduce speed so as to bring and have the earth mover under control when it reached the highway. Harris, the operator of the earth mover, notwithstanding he had seen the truck, could have observed the truck, but did not do so, as it proceeded on the highway toward the ramp. Harris, approaching the ramp on level ground, continued to operate a vehicle weighing 166,000 pounds in high gear at "20 mph." He did not apply his (air) brakes until he saw the truck "coming up on the ramp." The earth mover was then "about 20 feet from the edge of the pavement."

There is no evidence that Gasperson looked straight ahead or re-duced his speed until he was "about 8 or 10 feet from the ramp or to the place where the vehicles collided." According to the evidence, when Gasperson did slow down he did so in the manner customary for trucks reaching and going over the ramp.

In our view, the only reasonable inference and conclusion to be drawn from plaintiff's evidence is that plaintiff operated its earth mov-er onto and partially across the ramp without first exercising due care to see that such movement could be made in safety and without injury to users of the public highway.

It is noted: According to Russell, the patrolman, after the collision Dampier told Russell that he (Dampier) "was flagging the earth mov-er on,"—"to come on across the road or the ramp that was built up around there." Russell was the first witness and said testimony was admitted only as it might tend to corroborate the testimony Dampier would thereafter give. Actually, it did not corroborate but was in con-flict with Dampier's testimony. In any event, it was not substantive.

evidence. Hence, whether it was favorable or adverse to plaintiff is an academic question.

For reasons stated, the judgment of the court below is affirmed.

Affirmed.